UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

MAURICE MACEWEN, Captain            )
                                    )
            Plaintiff,              )
                                    )
    v.                              )        Case No. 1:25-cv-01580-TWP-MJD
                                    )
AMERICAN AIRLINES, INC.,            )
TIMOTHY AIREY Captain,              )
KEITH FIRMIN Captain,               )
ADRIENNE WOOLEY Captain,            )
                                    )
            Defendants.             )

**ORDER ON DEFENDANTS' MOTION TO DISMISS**

This matter is before the Court on a Motion to Dismiss Plaintiff's First Amended Complaint

filed by Defendants American Airlines, Inc. ("American"), Captain Timothy Airey ("Captain

Airey"), Captain Keith Firmin ("Captain Firmin"), and Captain Adrienne Wooley ("Captain

Wooley") (together, the "Defendants") (Filing No. 28). Also before the Court is *pro se* Plaintiff

Maurice MacEwen's ("Captain MacEwen") Motion for Leave to File Declaration in Support of

Opposition to Defendants Motion to Dismiss (Filing No. 38). Captain MacEwen, an airline pilot,

filed an Amended Complaint alleging that American engaged in discrimination and retaliation in

violation of the Americans with Disabilities Act and Title VII of the Civil Rights Act of 1964, as

well as a state law claim of intentional infliction of emotional distress (Filing No. 23). For the

reasons stated below, Captain MacEwen's request for leave is **denied** and Defendants' motion to

dismiss is **granted in part** and **denied in part**.

## I.        BACKGROUND

The following facts are not necessarily objectively true, but as required when reviewing a

motion to dismiss, the Court accepts as true all factual allegations in the complaint and draws all

inferences in favor of Captain MacEwen as the non-moving party. *See Bielanski v. Cnty. of Kane*, 550 F.3d 632, 633 (7th Cir. 2008).

A.      **Factual Background**

Captain MacEwen, a resident of Indiana, is a qualified airline Captain employed by American and has been since 2019 (Filing No. 23 at ¶ 11). He began his career as a pilot in 2007 and, prior to flying for American, was employed with PSA Airlines. *Id.* at ¶ 26–27. According to Captain MacEwen, PSA Airlines is a wholly owned subsidiary of American. *Id.* During his employment with American, Captain MacEwen's bid base was primarily Washington National Airport ("DCA"), with a short-term assignment at Philadelphia International Airport ("PHL"). *Id.* at ¶ 20.

In 2017, while employed by PSA Airlines, Captain MacEwen disclosed "an alcohol problem to aviation medical authorities" and entered the Human Intervention Motivational Study or "HIMS" program, which is a program overseen by the Federal Aviation Administration ("FAA"). *Id.* at ¶ 27. The FAA authorizes certain airlines, such as American, to administer its own HIMS program in lieu of the HIMS program directly overseen by the FAA. *Id.* at ¶ 41. In administering its HIMS program, American employes Aviation Medical Advisory Services ("AMAS") for HIMS related services. *Id.* at ¶ 15. AMAS physicians and staff act as American's agents under American's authority and control. *Id.*

Following his disclosure, Captain MacEwen was formally diagnosed with a substance use disorder and became subject to FAA approved monitoring and Special Issuance medical certification.[1] *Id.* at ¶ 28. Part of the parameters required of Captain MacEwen were drug and

---

[1] A special issuance is the conditional authorization of a medical certificate by the FAA for a pilot with specific conditions that would otherwise disqualify the pilot for the medical certificate sought. The pilot must adhere to the requirements within the special issuance and the pilot must demonstrate his or her operation of the duties authorized by the class of medical certificate will not endanger public safety.

alcohol testing and monthly peer meetings. *Id.* at ¶¶ 34, 39–40. As a part of "mandated treatment and monitoring" Captain MacEwen "was directed and pressured" into Alcoholics Anonymous ("AA") by AMAS. *Id.* at ¶ 29–30. His participation in AA was "not freely chosen religious activities, but the result of coercion linking his employment and medical status to his agreement to participate in a religiously oriented program." *Id.* at ¶ 32. AMAS staff made clear that participation in AA was not optional, rather it was a condition to successfully navigate HIMS, retaining a medical certificate, and a career. *Id.* at ¶ 30–31. After years of monitoring and coercion, Captain MacEwen was eventually granted a Special Issuance first-class medical certificate, however, his monitoring conditions remained strict and long-term under the FAA framework applicable to similarly situated pilots. *Id.* at ¶ 38.

In 2019, Captain MacEwen left PSA and began working for American as an airline pilot. His employment was closely tied to his compliance with the HIMS and Special Issuance requirements (i.e., drug and alcohol testing, peer review, AA participation). *Id.* at ¶¶ 39–40, 69–74. Captain MacEwen's primary management contact at DCA was Captain Firmin, and during his short-term assignments at PHL, his management contacts were Captains Airey and Wooley. *Id.* at ¶ 39–40. Captain MacEwen continued to fly for American and participated in the company's HIMS program for over six years, remaining in full compliance with the program requirements. *Id.* at ¶¶ 34, 38–40. He completed hundreds of drug and alcohol tests, with all results returning negative, and attended hundreds of peer meetings. *Id.* Captain MacEwen completed all requirements of the FAA's Special Issuance and maintained medical certificate. *Id.*

In the summer of 2021, Captain MacEwen applied to the Federal Flight Deck Officer ("FFDO") program. *Id.* at ¶ 58.[2] His application into the program was denied in February 2023

---

[2] This program allows certified airline pilots to be deputized as federal law enforcement officers to defend the flight decks of air carriers against acts of criminal violence or air piracy. *See* 49 U.S.C. § 44921.

(Filing No. 23 at ¶ 59). After denial, Captain MacEwen requested a copy of his employment file from the DCA base administration, and his employment file did not reveal any disciplinary history at that time. *Id.* at ¶ 60.

In November 2023, Captain MacEwen opted to exit the HIMS program administered by American and transitioned to direct compliance with the Special Issuance. *Id.* at ¶ 41–43. After exiting, the FAA issued an updated Special Issuance confirming Captain MacEwen's fitness to fly and continued medical oversight. *Id.* The Special Issuance also mandated Captain MacEwen "to attend monthly meetings with a chief pilot or flight operations supervisor." *Id.* After this transition, American management (Captains Airey, Wolley, and Firmin) assumed responsibility for Captain MacEwen's compliance with the Special Issuance. *Id.* Captain Airey imposed rigid requirements, such as monthly meetings occurring in-person and in Philadelphia despite Captain MacEwen being based at DCA. *Id.* He also imposed the requirement that meetings occur only during the second week of each month and offered no flexibility to reschedule. *Id.*

Captain MacEwen made every effort to attend his monthly meetings and even used personal time and "jumpseat travel." *Id.* at ¶ 44-49. But in April 2024, Captain MacEwen was unable to meet on a Friday because the seat he had planned to use became unavailable. *Id.* In an attempted remedial measure, Captain MacEwen travelled to Philadelphia on his day off to meet with Captain Airey. *Id.* Captain MacEwen sought to reschedule the April 2024 meeting, as nearly two weeks remained in the month, but Captain Airey refused. *Id.* Captain Airey had already submitted a noncompliance report to Captain MacEwen's HIMS AME (aviation medical examiner) and confirmed that the meeting would not count toward compliance with Captain MacEwen's Special Issuance. *Id.*

Captain MacEwen later obtained a copy of the noncompliance report, which grossly mischaracterized the circumstances surrounding the missed meeting. *Id.* at ¶ 50–52. Several weeks later, Captain MacEwen learned that he was "eligible for positive space travel for such meetings" at the time but was never informed that it was an option. *Id.* Despite Captain Airey learning that Captain MacEwen was not at fault and had taken prompt corrective action, Captain Airey made no effort to amend the noncompliance report to the FAA or Captain MacEwen's AME. *Id.*

In February 2024, Captain MacEwen submitted a Freedom of Information Act ("FOIA") request which revealed that Captain Firmin disclosed his confidential medical information pertaining to his substance use disorder to the Transportation Security Administration ("TSA") without consent. *Id.* at ¶ 58–68. In addition, Captain Firmin submitted information to TSA indicating Captain MacEwen had been disciplined in a way that suggested Captain MacEwen posed a risk or engaged in misconduct. *Id.* Captain Firmin was acting as DCA's Chief Pilot at the time. *Id.* Captain MacEwen alleges this information was false and inconsistent with his personnel file, so he confronted Captain Airey with the FOIA records. *Id.* Captain Airey did not take any action regarding the false information in Captain MacEwen's personnel file despite knowing the information was false and despite being Captain Firmin's direct supervisor. *Id.* Captain MacEwen alleges that he was deprived of significant professional opportunities and stigmatized based on his disability history. *Id.*

On multiple occasions, either Captain Airey or Captain Wooley distorted their interactions with Captain MacEwen when reporting his conduct. *Id.* at ¶ 45–46. For example, one or both reported on multiple occasions that Captain MacEwen attempted to circumvent or alter the terms of his HIMS monitoring by requesting to conduct monthly meetings when Captain MacEwen was

5

on scheduled flight duty with a layover in Philadelphia. *Id.* This characterization distorted Captain MacEwen's otherwise polite and respectful attempt to avoid scheduling conflicts. *Id.*

In late 2024, Captain MacEwen began experiencing targeted scrutiny from Captain Firmin, who contacted him under the pretext of a wellness check regarding Captain MacEwen's use of sick days near holidays. *Id.* at ¶ 53–57. Captain MacEwen had no history of abusing sick time and had sufficient accrued time off. *Id.* He believes the wellness check was "retaliatory and driven by his disability history and protected activity" because this was the first instance in Captain MacEwen's career where he had been contacted regarding using sick time. *Id.* Captain Airey also anticipated the issue in a subsequent meeting and attempted to justify Captain Firmin's actions by stating that it was standard procedure to flag pilots for using sick time near holiday periods. *Id.* The flagged wellness check by Captain Firmin resulted in a personnel event history entry in Captain MacEwen's employment file, which Captain MacEwen disputed in a written rebuttal. *Id.* Captain MacEwen alleges that the entry was unjustified, and inconsistent with policy. *Id.* He believes the personnel event in his employment file "appeared retaliatory . . . in light of his recent EEOC activity and the fact that he had sufficient accrued sick time." *Id.* The actions taken against Captain MacEwen were also intended to "portray him as noncompliant or unstable." *Id.*

In January 2025, the FAA issued an updated Special Issuance removing the requirement that Captain MacEwen meet monthly with a chief pilot. *Id.* at ¶ 83–88. Captain MacEwen informed American of the updated Special Issuance through his union appointed attorney but American refused to accept it despite being produced through procedures implemented by American. *Id.* Captain MacEwen then obtained a letter from the FAA official who personally signed his updated Special Issuance, which confirmed the substance of the changes, but American refused to accept the letter as well. *Id.* American then threatened that Captain MacEwen would be placed on unpaid

leave unless he physically produced and displayed his Special Issuance. *Id.* Despite Captain MacEwen's concerns for medical privacy, he was forced to comply in the face of threatened unpaid leave and loss of income. *Id.*

Since initiating this action on August 8, 2025, Captain MacEwen has continued to experience targeted scrutiny. *Id.* at ¶ 89–93. He has been required to document baseless claims by others, such as a supposed refusal to swap into a substitute aircraft in September 2025, which could portray him as uncooperative or insubordinate if left uncorrected. *Id.* Captain MacEwen learned of the claim from a fellow pilot but is unaware of where the claim originated. *Id.* Captain MacEwen believes it was in retaliation for filing this lawsuit. *Id.*

**B.    Administrative Remedies**

As it relates to this lawsuit, Captain MacEwen filed two charges of discrimination with the Equal Employment Opportunity Commission ("EEOC"). *Id.* at ¶ 21. The first charge, 450-2024-06444, was filed on September 5, 2024 (Filing No. 30-1), and a notice of right to sue was issued on December 1, 2025 (Filing No. 23 at ¶ 21; Filing No. 30-6). The second charge, 470-2025-02145, was filed on June 16, 2025 (Filing No. 29-7), and the corresponding notice of right to sue was issued on June 20, 2025 (Filing No. 30-5).

**C.    Captains Airey, Firmin , and Wooley's (The "Supervisors") Respective Backgrounds**

During the relevant time period, Captain Airey lived in Fort Worth, Texas, and was the Chief Pilot and Managing Director of Flight Line Operations for American (Filing No. 29-8). His duties for American are mostly carried out in Fort Worth and do not involve oversight of any airports within Indiana. *Id.* Captain Airey has not travelled to Indiana from 2021 through the filing of this lawsuit. *Id.* He does not own property in or have significant ties to Indiana. *Id.*

Defendant Captain Firmin, he is a resident of Alexandria, Virginia, and works as a Check Pilot for American in Washington D.C. (Filing No. 29-9). Most of his time working is spent in

7

Washington D.C. and his duties do not involve any oversight of airports within Indiana. *Id.* From 2021 to the filing of this lawsuit, Captain Firmin has not traveled to Indiana. *Id.* Captain Firmin does not own property in Indiana and does not have significant ties to the state. *Id.*

During the relevant time period Captain Wooley lived in Philadelphia, Pennsylvania, and was the Director of Flight and Chief Pilot for American in Philadelphia (Filing No. 29-10). When carrying out her duties for American, she spends most of her time in Philadelphia but has oversight responsibilities in Washington D.C. *Id.* She does not have oversight of any airport in Indiana and does not normally travel to Indiana for work. *Id.* Captain Wooley did not travel to Indiana from 2021 to the filing of this lawsuit, nor does she own property in or have any significant ties to Indiana. *Id.*

## II.    LEGAL STANDARDS

### A.    12(b)(1) – Subject Matter Jurisdiction

A motion to dismiss under Rule 12(b)(1) challenges a court's subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). The burden of proof is on the plaintiff, the party asserting jurisdiction. *United Phosphorus, Ltd. V. Angus Chem. Co.*, 322 F.3d 942, 946 (7th Cir. 2003), *overruled on other grounds by Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845 (7th Cir. 2012) (en banc). "The plaintiff has the burden of supporting the jurisdictional allegations of the complaint by competent proof." *Int'l Harvester Co. v. Deere & Co.*, 623 F.2d 1207, 1210 (7th Cir. 1980). "In deciding whether the plaintiff has carried this burden, the court must look to the state of affairs as of the filing of the complaint; a justiciable controversy must have existed at that time." *Id.*

"When ruling on a motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), the district court must accept as true all well-pleaded factual allegations, and draw reasonable inferences in favor of the plaintiff." *Ezekiel v. Michel*, 66 F.3d 894, 897 (7th Cir. 1995) (citation omitted). Furthermore, "[t]he district court may properly look

8

beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Id.* (citation and quotation marks omitted).

**B.      12(b)(2) – Personal Jurisdiction**

A motion under Rule 12(b)(2) challenges whether a court has personal jurisdiction over a defendant. Fed. R. Civ. P. 12(b)(2). The court accepts all factual allegations in the complaint as true and draws all reasonable inferences in favor of the plaintiff if they weigh on personal jurisdiction. *Int'l Med. Grp., Inc. v. Am. Arb. Ass'n*, 149 F. Supp. 2d 615, 623 (S.D. Ind. 2001). If the complaint, however, consists of conclusory allegations unsupported by factual allegations, the complaint fails the liberal standard of Rule 12(b). *Id*. The complaint does not need to include factual allegations concerning personal jurisdiction but, if the defendant moves to dismiss under Rule 12(b)(2), the plaintiff "bears the burden of demonstrating the existence of jurisdiction." *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003).

The extent of a plaintiff's burden is dependent upon the method by which the court determines the issue of personal jurisdiction. *Id*. "When the . . . court holds an evidentiary hearing to determine [personal] jurisdiction, the plaintiff must establish [personal] jurisdiction by a preponderance of the evidence." *Id*. But where the court determines personal jurisdiction based only on reference to submissions of written materials, the plaintiff simply needs to make a prima facie case of personal jurisdiction. *GCIU-Emp. Ret. Fund v. Goldfarb Corp.*, 565 F.3d 1018, 1023 (7th Cir. 2009).

In determining whether the plaintiff has met the prima facie standard, the plaintiff is entitled to a favorable resolution of all disputed relevant facts. *uBID, Inc. v. GoDaddy Grp., Inc.*, 623 F.3d 421, 423–24 (7th Cir. 2010). If the defendant has submitted evidence in opposition to the implementation of jurisdiction, however, "the plaintiff must go beyond the pleadings and submit

9

affirmative evidence supporting the exercise of jurisdiction." *Purdue*, 338 F.3d at 782–83. This evidence submitted by the defendant may include affidavits, unless the affidavits merely contain conclusory assertions that the court lacks personal jurisdiction over the defendant. *Id*. at 783 (quoting *Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1269 (11th Cir. 2002)).

**C.**     **12(b)(6) – Failure to State a Claim**

Rule 12(b)(6) allows a defendant to move to dismiss a complaint that has failed to "state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When deciding a motion to dismiss under Rule 12(b)(6), the Court accepts as true all factual allegations in the complaint and draws all inferences in favor of the plaintiff. *Bielanski v. Cnty. of Kane*, 550 F.3d 632, 633 (7th Cir. 2008). However, courts "are not obliged to accept as true legal conclusions or unsupported conclusions of fact." *Hickey v. O'Bannon*, 287 F.3d 656, 658 (7th Cir. 2002).

The complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In *Bell Atlantic Corp. v. Twombly*, the Supreme Court explained that the complaint must allege facts that are "enough to raise a right to relief above the speculative level." 550 U.S. 544, 555 (2007). Although "detailed factual allegations" are not required, mere "labels," "conclusions," or "formulaic recitation[s] of the elements of a cause of action" are insufficient. *Id.*; *see also Bissessur v. Indiana Univ. Bd. of Trs.*, 581 F.3d 599, 603 (7th Cir. 2009) ("[I]t is not enough to give a threadbare recitation of the elements of a claim without factual support"). The allegations must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. Stated differently, the complaint must include "enough facts to state a claim to relief that is plausible on its face." *Hecker v. Deere & Co.*, 556 F.3d 575, 580 (7th Cir. 2009) (citation and quotation marks omitted). To be facially plausible, the complaint must allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S.

10

at 556). *Pro se* complaints are construed liberally and held "to a less stringent standard than formal pleadings drafted by lawyers." *Perez v. Fenoglio*, 792 F.3d 768, 776 (7th Cir. 2015).

### III.    **DISCUSSION**

Captain MacEwen brings six claims in his Amended Complaint: Count One: Disability Discrimination (ADA), Count Two: Failure to accommodate/Interference (ADA), Count Three: Retaliation (ADA), Count Four: Religious Discrimination (Title VII),  Count Five: Retaliation (Title VII), are all brought against American (Filing No. 23 at 12-15).  Captain MacEwen brings Count Six: Intentional Infliction of Emotional distress against all Defendants. *Id*. at 15. He alleges that American used his disability—substance use disorder—and HIMS/Special Issuance status as leverage by coercing him to participate in a religiously based program (AA) as a condition of keeping his career, refused reasonable accommodation, retaliated when he asserted his rights, and all the Defendant's intentionally inflicted emotional distress.

Defendants seek dismissal Captain MacEwen's claims against American for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted. The Motion seeks dismissal of the intentional tort claim against the Supervisors on the same grounds, as well as for lack of personal jurisdiction.

Before addressing the merits of the Amended Complaint, the Court must first determine jurisdiction. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) ("Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause.") (citing *Ex parte McCardle*, 7 Wall. 506, 514 (1868)); *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 577 (1999) ("Jurisdiction to resolve cases on the merits requires both authority over the category of claim in suit (subject-matter jurisdiction) and authority over the parties (personal jurisdiction), so that the court's decision will bind them.").

11

A.       **Subject Matter Jurisdiction**

The subject matter of federal district courts is established by statute. Generally, there are two paths into a federal district court: by asserting a claim that arises under federal law, or by invoking a court's diversity jurisdiction. *See* 28 U.S.C. §§ 1331, 1332. If a plaintiff invokes the former, colloquially called federal question, the district court has "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." *Id.* at § 1367.

"The preemption doctrine is based in the Supremacy Clause of the Constitution." *Hoagland v. Town of Clear Lake, Indiana*, 415 F.3d 693, 696 (7th Cir. 2005). "Whether federal law pre-empts a state law establishing a cause of action is a question of congressional intent." *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 252 (1994) (citing *Allis–Chalmers Corp. v. Lueck*, 471 U.S. 202, 208 (1985)). Of course, if Congress intended to preempt state law, it could explicitly say so with a statement of "whether and to what extent a state law is preempted." *Lueck*, 471 U.S. at 208–09. However, congressional intent is not always expressed. In such cases, a court must determine whether the state law "conflicts with federal law or would frustrate the federal scheme, or unless the courts discern from the totality of the circumstances that Congress sought to occupy the field to the exclusion of the States." *Id.*; *see also Hoagland*, 415 F.3d 693, 696.

Similarly, whether a claim pursuant to federal law is precluded "requires an analysis of both [federal statutes], to see if they are indeed incompatible or if they can be harmonized." *Brown v. Illinois Cent. R.R. Co.*, 254 F.3d 654, 661–62 (7th Cir. 2001) (alteration in original) (citing *Coker v. Trans World Airlines, Inc.*, 165 F.3d 579, 583 (7th Cir. 1999)). If the statutes "are incompatible" a court must "decide which one Congress meant to take precedence." *Id.* In either scenario, if a claim is precluded or preempted, a court should dismiss for lack of subject matter jurisdiction. *See Brown*, 254 F.3d at 668 (affirming dismissal of precluded claims for lack of subject matter

12

jurisdiction); *Brotherhood of Maint. of Way Emps. Div./IBT v. Norfolk S. Ry. Co.*, 745 F.3d 808, 815 (7th Cir. 2014) (same); *but cf. Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 831 (7th Cir. 2014) (questioning but not deciding whether dismissal of precluded claims should be for lack of subject matter jurisdiction).

Defendants move to dismiss Captain MacEwen's federal claims arguing that they are precluded, and the state-law claims are preempted, by the Railway Labor Act. They also move to dismiss Captain MacEwen's intentional tort claim arguing it is preempted by the Federal Aviation Act. The Court will address each argument in turn.

### 1. Railway Labor Act

The purpose of the Railway Labor Act ("RLA") is well established. *See, e.g., Hawaiian Airlines*, 512 U.S. at 252) (discussing the purpose and goals of the RLA). "The RLA exists to 'promote stability in labor-management relations by providing a comprehensive framework for resolving labor disputes.'" *Hoffstead v. Northeast Illinois Reg'l Commuter R.R. Corp.*, 132 F.4th 503, 513 (7th Cir. 2025) (quoting *Hawaiian Airlines*, 512 U.S. at 252). "It does so by requiring arbitration of certain claims, including so-called 'minor disputes,'" which "are not identified by their importance." *Id.* (first quoting *Hawaiian Airlines*, 512 U.S. at 252–53, then citing *BLET GCA UP v. Union Pac. R.R. Co.*, 988 F.3d 409, 412 (7th Cir. 2021)). "Instead, a dispute is 'minor' if its resolution requires interpretation of a [collective bargaining agreement ("CBA")], or if it can be 'conclusively resolved' by interpreting the CBA." *Id.* at 513–14 (quoting *Brown*, 254 F.3d at 658). "This latter category includes claims that do 'not involve rights that exist independent of the CBA.'" *Id.* (quoting *Hawaiian Airlines*, 512 U.S. at 265).

While "[b]oth the source of plaintiff's claim and whether the claim requires interpretation of the CBA are crucial considerations for courts evaluating whether the RLA preempts a particular claim," they "do not preclude all claims that involve the CBA." *Id*. at 514 (citing *Monroe v.*

13

*Missouri Pac. R. Co.*, 115 F.3d 514, 519 (7th Cir. 1997)). "[I]f the CBA is merely relevant, but not dispositive, to the claim, then judicial resolution is not precluded." *Id.* (citing *Brown*, 254 F.3d at 668). "And generally, 'the RLA does not require arbitration of claims asserting rights established by state or federal law independent of a [CBA].'" *Id.* (alteration in original) (quoting *Carlson*, 758 F.3d at 833).

The mere existence of overlap between a collective bargaining agreement and the law serving as the basis for a plaintiff's claims does not necessarily mean the RLA controls. *See id.* (finding "claims under Title VII could proceed in federal court even if the [CBA] prohibited sex discrimination and retaliation."). This is true even if a CBA "arguably justified" an employer's actions, for example, in failing to promote an employee because he or she "did not have the qualifications specified in the [CBA]." *Carlson*, 758 F.3d at 833. Where a plaintiff's claims, "depend on a 'factual inquiry into any retaliatory [or discriminatory] motive of the employer' rather than on an interpretation of the [CBA]," such claims are not precluded by the RLA. *Id.* (first alteration in original) (citing *Hawaiian Airlines*, 512 U.S. at 266).

Defendants argue that the Amended Complaint "centers on actions allegedly taken by American . . . [that] concern specific terms and conditions of the CBA." (Filing No. 29 at 29). They contend that the CBA "govern[s] when, why, and how" pilots maintain medical certificates, an airline maintains drug and alcohol information associated with a pilot's rehabilitation, sick leave review, and entries in personnel files. *Id.* According to Defendants, "to determine whether [their] conduct was permissible versus violative of the ADA, Title VII, or Indiana common law, necessarily leads to a contract interpretation dispute inextricable from the CBA." *Id.* at 30.

The Court is not persuaded by Defendants' arguments. At best, the CBA provides context but it does not conclusively resolve Captain MacEwen's claims. Captain MacEwen alleges that

14

American engaged in conduct amounting to what he describes as "targeted scrutiny" that effectively amounts to discrimination or was done in retaliation because he engaged in some asserted protected activity (Filing No. 23 at ¶ 53). For example, wrongly creating a personnel event history in an employment file for using sick time near holidays, *id.* at ¶ 56–57, increasing the burden and making compliance with his Special Issuance more difficult, *id.* at ¶ 41–44, making false or distorted assertions in his FAA file, *id.* at ¶ 46, misrepresentations to the TSA and intentionally depriving Captain MacEwen of a program, *id.* at ¶ 62, and threatening to place Captain MacEwen on unpaid leave, *id.* at ¶ 86—if true, would be conduct that goes to the motive of the employer.

The same is true for Captain MacEwen's state law claim. A claim of intentional infliction of emotional distress would not conflict with the RLA nor frustrate its scheme. *Cf. Richardson v. BNSF Ry. Co.*, 2 F.4th 1063, 1068 (8th Cir. 2021) (finding claim of intentional infliction of emotional distress based on allegations that the employer refused to rehire the plaintiff after wrongful termination was not preempted by RLA because it could be resolved without interpreting the CBA). For example, Captain MacEwen alleges that he was essentially forced to attend AA under threats of unpaid leave (or his termination), he was forced to endure burdensome monthly meeting requirements in Philadelphia, and Captain Firmin made false and damaging statements to the TSA, effectively depriving him of entry into a program.

Defendants' assertion that resolution of Captain MacEwen's claims would necessitate interpretation of the CBA is not correct (Filing No. 29 at 32–33). While the CBA broadly covers drug and alcohol testing of pilots, as well as pilot physical examination (Filing No. 29-2 at 27, 39), the CBA does not, for example, *specifically* require American employees to force Captain MacEwen to travel to Philadelphia as opposed to Washington D.C., or *specifically* mandate his

attendance in AA. Even when reviewing Captain MacEwen's Special Issuance, it is not clear whether he was required to specifically attend AA. All it says is that Captain MacEwen must maintain "attendance at Peer Support Group meetings (e.g., AA meetings, Board meetings, etc.)" at least twice weekly (Filing No. 29-6). The RLA does not act so broadly as to preempt any claim that might arise because of alleged malfeasance or misfeasance by other employees in carrying out their duties and which are *loosely* discussed in that CBA. In other words, the CBA is not central to Defendants' intentions or whether they conducted themselves in a sufficiently outrageous manner.[3] The Court thus declines to find Captain MacEwen's intentional tort preempted by the RLA.

### 2. The Federal Aviation Act

Defendants next argue that Captain MacEwen's intentional tort is preempted by the Federal Aviation Act ("Aviation Act") because the claim would encroach on American's obligations to comply with alcohol and drug testing requirements mandated by FAA regulations. They contend, if successful, Indiana law would bind American to treat Captain MacEwen differently than required by the Aviation Act, dictate American's ability to substantiate the existence of a valid Special Issuance, and prevent American from determining whether a pilot is in compliance with FAA restrictions and, if so, the removal of the pilot from flight duties (Filing No. 29 at 34). Defendants further contend that Indiana law would encroach on American's obligation to provide reports to the FAA as part of the HIMS program, which would conflict with FAA regulations. The Court is not persuaded.

Defendants have not pointed to any statute or regulation that expressly supports the contention that Congress has sought to exclude tort claims arising under state law against

---

[3] *Cf. Bradley v. Hall*, 720 N.E.2d 747, 752 (Ind. Ct. App. 1999) (discussing the elements of intentional infliction of emotional distress, which requires extreme and outrageous conduct that was intended to, or recklessly did, cause severe emotional distress).

employees of airline companies. Nor have the parties pointed to any Seventh Circuit case that has addressed the specific issue, and the Court is unaware of any. The Seventh Circuit recently discussed claims by plaintiffs seeking damages against freight brokers for negligent hiring of motor carriers, which were preempted by the Federal Aviation Administration Authorization Act. *See Ye v. GlobalTranz Enterprises, Inc.*, 74 F.4th 453 (7th Cir. 2023), *Montgomery v. Caribe Transp. II, LLC*, 124 F.4th 1053, 1054 (7th Cir. 2025). But the United States Supreme Court granted certiorari on the issue in *Montgomery*, 606 U.S. 1066 (2025) and reversed the Seventh Circuit. 608 U.S. ----, No. 24-1238, 2026 WL 1336188 (U.S. May 14, 2026). The Supreme Court found an express statement of preemption by Congress explicitly exempted "the safety regulatory authority of a State with respect to motor vehicles." *Id.* at 4. But these cases dealt with express statements of preemption, which is missing here.

The Court agrees that Congress's intent for certain FAA regulations to occupy the field of commercial aviation safety to the exclusion of the states is clear, as has been found by several cases from the Supreme Court and other circuits. But this is only in certain circumstances. The Seventh Circuit discussed several of these cases, concluding that many had at least one thing in common: "They involve[d] issues which reach far beyond a single local jurisdiction and which cannot sensibly be resolved by a patchwork of local regulations." *Hoagland v. Town of Clear Lake, Ind.*, 415 F.3d 693, 698 (7th Cir. 2005). The majority of these cases dealt with state or local laws pertaining to "noise regulation ordinances and flight pattern controls." *See id.* at 697 (discussing cases).

However, in *French v. Pan Am Exp., Inc.*, plaintiff (a pilot), was terminated for refusing to submit to drug testing, which was demanded by the airline company. 869 F.2d 1, 1 (1st Cir. 1989). The plaintiff cited a state statute that prohibited employers from demanding its employees submit

17

to drug testing absent certain criteria. *Id.* at 1–2. The First Circuit found the state law preempted because "Congress [] adequately evinced its intention to occupy the field of pilot regulation related to air safety." *Id.* at 7.  As for state common law tort, a question closer to this case, the Third Circuit in *Abdullah v. American Airlines, Inc.* held that "*any* state or territorial standards of care relating to aviation safety [were] federally preempted" because federal regulations specifically established the standard of care for pilots operating an aircraft. 181 F.3d 363, 365 (3d Cir. 1999) (emphasis in original). But the *Abdullah* court stopped short of finding an entire tort claim preempted by federal law.

And even closer was the issue in *Frank v. Delta Airlines Inc.*, where an airline company fired the plaintiff, an aircraft mechanic, and reported to the FAA that the plaintiff refused to submit to a drug test because his urinalysis sample tested positive for a drug masking chemical. 314 F.3d 195, 197 (5th Cir. 2002). The plaintiff brought state law tort claims against his employer, including negligence, intentional infliction of emotional distress, and defamation. *Id.* The Fifth Circuit in *Frank* found that the plaintiff's tort claims were preempted by the Omnibus Transportation Employee Testing Act of 1991 ("OTETA"). *Id.* at 202.

The purpose of OTETA was "to combat drug and alcohol abuse by individuals employed in the airline industry and, among other things, authorized random drug testing of employees in safety-sensitive positions." *Id.* at 198. When it enacted OTETA, Congress "not only approved [the] FAA's authority to issue pre-emptive regulations both before and after OTETA was passed," but it also sought to preempt state common law tort claims with a statement explicitly saying so. *See id.* at 198–99 (citing *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993)). The Fifth Circuit went on to find that the FAA regulations "substantially subsume[d]" the subject matter of the airline's alleged actions because they prescribed the precise procedures for collecting and reporting

18

specimens. *Id.* at 202. This included the selection of a certified laboratory to perform the drug testing; the design, implementation, and review of quality assurance procedures to monitor each step of the testing; and the requirement that employers notify the FAA of an employee's refusal to submit to a drug test. *Id.* at 202–03.

It is clear from *Frank* that the FAA is the exclusive owner of drug testing for aviation personnel performing safety-sensitive functions. *See also* 14 C.F.R. § 67.121 (preempting "any State or local law, rule, regulation, order, or standard covering the subject matter of 14 CFR parts 65, 91, 121, and 135, including but not limited to, drug testing of aviation personnel performing safety-sensitive functions."). Yet, this case does not involve the procedures for drug testing.

As Defendants argue, there is no question that the FAA has extensive regulations pertaining to airmen and, in particular, their medical standards. For example, the regulations specifically cover the physical standards of airmen holding a first-class medical certificate, 14 C.F.R. § 67.101-67.115, and medical certificate procedures, which includes special issuances. *Id.* at § 67.401-67.415. The regulations also contain drug and alcohol testing, *id.* at § 120.1, which includes reporting results or refusals to the FAA. *Id.* at § 120.111. But, when it comes to preemption, none of these subparts are in "parts 65, 91, 121, [or] 135," the parts specifically covered by an express statement of preemption. *Id.* at § 120.121.

In absence of an expressed statement of preemption, this case falls somewhere between *Frank* and *Abdullah*. In his response, Captain MacEwen contends that he does not "seek[] to impose any alternative safety regime or medical requirements," and that he is not challenging the FAA's authority in this area (Filing No. 30 at 29–30). This contention is helpful, but it does not end the inquiry. If, for example, Captain MacEwen's allegations implicate conduct that Defendants assert was done because they were required to comply with federal regulations, such a claim would

favor preemption under *Frank*. This is because it is paramount that a regulated entity complies with federal regulations pertaining to the safety of mass transportation in an area that is unquestionably within the purview of the federal agency. Permitting an intentional tort could put Defendants in the peculiar position of either complying with federal regulations at the risk of potential lawsuits by aggrieved persons or disregarding the federal regulation at the risk of enforcement action by the FAA. *See* 14 C.F.R. § 13.13–13.29. In both cases, the common law tort claim must give way to the federal regulation. *Cf. Frank*, 314 F.3d at 199.

On the other hand, in absence of an express statement by either Congress or the agency exercising a valid grant of authority, an individual such as Captain MacEwen does not lose the right to assert a tort claim against a supervisor for some of the conduct alleged here. This is true even if part of the supervisor's conduct is broadly covered by federal law. Nor does Captain MacEwen relinquish the right to assert a claim by virtue of federal law regulating certain aspects of his profession.

Captain MacEwen's allegations fall in the latter. He alleges that Defendants engaged in conduct that intentionally made it more difficult for him to comply with his Special Issuance, effectively deprived him of entry into a program run by the TSA by making false statements, and wrongly created a personnel event history in an employment file for using sick time near holidays. At this stage of the proceedings, the Court must accept Captain MacEwen's claims as true. The tort claim would not undermine federal law, either by threatening compliance or effectively establishing an exemption for Captain MacEwen, because the alleged conduct is extraneous for American's effective compliance with the regulations at issue. It would be different if Captain MacEwen did not want to comply with his Special Issuance at all, or if he were challenging conduct that was required by federal law. This does not appear to be the case.

It is important to note that this jurisdiction assessment is separate from whether Captain MacEwen has adequately pleaded his intentional tort. Whether there is merit in his allegations or whether he will ultimately prevail is not a part of this analysis. At this juncture, the Court assumes the truth of Captain MacEwen's allegations and that he has adequately pleaded a claim of intentional infliction of emotional distress. In this light, the Court cannot say that it lacks subject matter jurisdiction to hear the claim. Accordingly, the Court does not find that the Aviation Act or other FAA regulation preempts Captain MacEwen's intentional tort.

**B.    Personal Jurisdiction**

Captain MacEwen has invoked the Court's federal question jurisdiction over his federal claims along with supplemental jurisdiction over his state law intentional tort. *See* 28 U.S.C. §§ 1331, 1367. Though separate and distinct concepts, the subject matter jurisdiction invoked by a plaintiff does play a role in whether a court can assume jurisdiction over a particular defendant. "In a case involving federal question jurisdiction, 'a federal court has personal jurisdiction over the defendant if either federal law or the law of the state in which the court sits authorizes service of process to that defendant." *Curry v. Revolution Lab'ys, LLC*, 949 F.3d 385, 393 (7th Cir. 2020) (citing *Mobile Anesthesiologists Chicago, LLC v. Anesthesia Assocs. of Houston Metroplex, P.A.*, 623 F.3d 440, 443 (7th Cir. 2010)). If a federal statute under which a plaintiff pursues his or her claim "does not authorize nationwide service of process," a court should look to "the state long-arm statute to determine defendant's amenability to service, which is 'a prerequisite to its exercise of personal jurisdiction.'" *Mobile Anesthesiologists*, 623 F.3d at 443. The ADA and Title VII do not have nationwide service of process,[4] so the Court can exercise jurisdiction only if the Supervisors could be served in Indiana under Indiana law. *See Id.*

---

[4] *Eiler v. S. Dakota Hum. Servs. Ctr.*, No. 16 C 4665, 2017 WL 8794293, at *2 (N.D. Ill. Dec. 18, 2017), *aff'd*, 736 F. App'x 145 (7th Cir. 2018).

"Indiana Trial Rule 4.4(A)—Indiana's 'long-arm' rule for exercising personal jurisdiction over out-of-state defendants—permits exercising personal jurisdiction in any manner that is consistent with the Due Process Clause of the Fourteenth Amendment to the United States Constitution." *Oswald v. Shehadeh*, 108 N.E.3d 911, 916-917 (Ind. Ct. App. 2018). Whether personal jurisdiction is proper under Indiana's long-arm statute and the Due Process Clause therefore "collapses into a single search for what the outer limits of due process permit." *Hotmix & Bituminous Equip. Inc. v. Hardrock Equip. Corp.*, 719 N.E.2d 824, 827 (Ind. Ct. App. 1999).

Personal jurisdiction over an out-of-state defendant permitted by the Due Process Clause arises in two forms. The first, general personal jurisdiction, allows a court "to hear any and all claims against [the out-of-state defendant] when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 317 (1945)). Specific jurisdiction, the second, is "confined to adjudication of 'issues deriving from, or connected with, the very controversy that establishes jurisdiction.'" *Id*.

To establish specific personal jurisdiction in the forum state, the defendant must have "certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *N. Grain Mktg., LLC v. Greving*, 743 F.3d 487, 492 (7th Cir. 2014) (quoting *Int'l Shoe*, 326 U.S. at 316). "The contacts needed for this kind of jurisdiction often go by the name 'purposeful availment.'" *Spokane Kart Racing Ass'n v. Am. Kart Track Promoters Ass'n, Inc.*, 206 N.E.3d 462, 467 (Ind. Ct. App. 2023), *trans. denied*, 212 N.E.3d 1230 (Ind. 2023) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)). Where "the plaintiff's claims are for intentional torts, the inquiry focuses on whether the conduct underlying the claims was purposely directed at the forum state." *Tamburo v. Dworkin*, 601 F.3d 693, 702 (7th

22

Cir. 2010) (citing *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1071 (10th Cir. 2008)). At bottom, a court must "ensure that an out-of-state defendant is not bound to appear to account for merely 'random, fortuitous, or attenuated contacts' with the forum state." *Id.*

Captain MacEwen asserts a single intentional tort against the Supervisors (Count Six). They have moved to dismiss the claim because each lives out of state, none of them own property in Indiana, they have not travelled to Indiana, and their employment does not include responsibilities in Indiana. Rather, their work is primarily located in Washington D.C., Philadelphia, or Fort Worth (Filing No. 29-8; Filing No. 29-9; Filing No. 29-10).

In response, Captain MacEwen makes several arguments, only one of which merits discussion. He argues that "the challenged conduct was expressly directed into Indiana through communications," such as emails, phone calls, text message, and written correspondence. Captain MacEwen's argument invokes the "effects test," which the Seventh Circuit has called the "express aiming" test. *Lab Verdict, Inc. v. Lab Equip Ltd.*, 436 F. Supp. 3d 1181, 1186 (S.D. Ind. 2020). Unfortunately for Captain MacEwen, this argument is unavailing.

First, Captain MacEwen completely failed to offer any evidence to rebut the Supervisors' evidence. Although Captain MacEwen filed a motion for leave to supplement his response with a fifty-three page declaration nearly a month after filing his response (Filing No. 38; Filing No. 38-1), the Court declines to consider the evidence. One, it does not help him and, two, the evidence was due with his response. *See* S.D. Ind. L.R. 7-1(b); *cf. Purdue Research*, 338 F.3d at 783 ("[T]he plaintiff must go beyond the pleadings and submit affirmative evidence supporting the exercise of jurisdiction."). Accordingly, Captain MacEwen's request for leave to file a declaration in Support of his opposition to Defendants Motion to Dismiss motion is **denied**.

Second, his allegations support a finding that none of the Supervisors intentionally aimed their conduct at Indiana but, rather, had "incidental and constitutionally irrelevant effects" on Captain MacEwen. *See Lab Verdict, Inc.*, 436 F. Supp. 3d at 1186. This point was illustrated in *Lab Verdict*, where the defendant posted defamatory statements about the plaintiff on the internet. *Id.* at 1187. In *Lab Verdict*, the defamatory posts specifically listed the plaintiff's Indianapolis address, accused the plaintiff of not being a legitimate business, and scam business practices, which were all aimed at deterring others from doing business with the plaintiff in Indiana. *Id.* The court found that the conduct was intentionally aimed at injuring the plaintiff's Indiana business with multiple defamatory posts. *Id. See also Tamburo*, 601 F.3d at 707–08 (finding that "the individual defendants purposely targeted [the plaintiff] and his business in Illinois with the express goal of inflicting commercial and reputational harm on him there, even though their alleged defamatory and otherwise tortious statements were circulated more diffusely across the Internet.").

Captain MacEwen alleges that the Supervisors made it more burdensome to comply with his Special Issuance by requiring him to meet in Philadelphia, making false and damaging statements to the TSA, threatening to withdraw sponsorship of his medical certificate, coercing him to participate in AA, and making misleading reports in his personnel file. None of this, however, establishes conduct that was intentionally directed at Indiana or made the state the focal point of the conduct. *See id.* Nor does the alleged conduct connect any of the Supervisors to Indiana in a meaningful way. *See id.* ("The proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way.").

Captain MacEwen's allegations that the Supervisors made it more burdensome to comply with his Special Issuance relates to activities that took place in Philadelphia and Washington D.C.,

as Captain MacEwen states that he was engaging in peer meetings in Washington D.C. prior to Captain Airey assuming oversight. The damaging statements to the TSA, threatening to withdraw sponsorship of his medical certificate, and making misleading reports in his personnel file concerns his employment with American in Washington D.C., where he was based, or Fort Worth, where American is headquartered—not Indiana. *See Calder v. Jones*, 465 U.S. 783, 788-89 (1984) (finding personal jurisdiction in California over a Florida company because the "allegedly libelous story concerned the California activities of a California resident," which "impugned the professionalism of an entertainer whose television career was centered in California[,] . . . and the brunt of the harm, in terms both of respondent's emotional distress and the injury to her professional reputation, was suffered in California.") (footnote omitted).

In the alternative, Captain MacEwen asks the Court to allow him to conduct limited discovery relating to jurisdiction. But he has not established a colorable or prima facie showing of personal jurisdiction. *See Central States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 946 (7th Cir. 2000) (citation omitted). Moreover, discovery into "the roles and responsibilities of Captains Airey, Firmin, and Wooley" (Filing No. 30 at 18), would yield little, if any, useful evidence as to personal jurisdiction. Captain MacEwen's own allegations establish that the Supervisors' responsibilities include airports in Washington D.C. or Philadelphia (Filing No. 23 at ¶ 16-18). As to whether the Supervisors sent any "emails, phone calls, text messages, and written correspondence" to Captain MacEwen in Indiana (Filing No. 30 at 18), these would have either been available to Captain MacEwen to submit with his response or to establish in a declaration. The Court will not place the burden on the Defendants to produce records that Captain MacEwen has or had access to. And discovery into "any other contacts [the Supervisors] or their agents had with [Indiana] relating to the claims," *id.*, is a plea to engage in an unhindered

25

fishing expedition that the Court is loath to permit. In absence of a colorable claim, the Court declines to permit Captain MacEwen to engage in limited discovery as to personal jurisdiction.

In sum, the Court agrees that dismissal for lack of personal jurisdiction is appropriate as to the intentional tort against the Supervisors. None have sufficient contacts with Indiana and what little (if any) contact they did have is either random, fortuitous, or attenuated. It would also be fundamentally unfair to subject them to litigation in this state in absence of conduct directed at Indiana. Count Six against Captains Airey, Firmin, and Wooley is therefore **dismissed** without prejudice.[5]  In addition, Captain MacEwen's motion for leave is **denied**.

## C.      Sufficiency of the Complaint

Lastly, regarding the merits of Captain MacEwen's allegations, American seeks dismissal of his federal claims because they were either not properly exhausted or do not plausibly state a claim for relief. American also argues that the intentional tort fails to state a plausible claim for relief against it.

### 1.   Failure to Exhaust

Before bringing either a Title VII or ADA claim, "a plaintiff must first exhaust his administrative remedies by filing charges with the EEOC and receiving a right to sue letter." *Chaidez v. Ford Motor Co.*, 937 F.3d 998, 1004 (7th Cir. 2019) (citation omitted) (Title VII), *Pierri v. Medline Indus., Inc.*, 970 F.3d 803, 806 (7th Cir. 2020) (citation omitted) (ADA). "After doing so, a plaintiff filing suit in federal court may bring only those claims that were included in her EEOC charge." *Chaidez*, 937 F.3d at 1004 (citing *Geldon v. S. Milwaukee Sch. Dist.*, 414 F.3d 817,

---

[5] *See Lauderdale-El v. Indiana Parole Bd.*, 35 F.4th 572, 576–77 (7th Cir. 2022) (finding dismissal for lack of personal jurisdiction is "necessarily without prejudice." (citations omitted)).

819 (7th Cir. 2005) (internal quotations omitted)). "This requirement has two purposes: first, it allows the EEOC and the employer an opportunity to settle the matter, and second, it ensures that the employer has adequate notice of the conduct the employee is challenging." *Id.* (citing *Teal v. Potter*, 559 F.3d 687, 691 (7th Cir. 2009)).

In determining whether a plaintiff's allegations fall within the scope of the EEOC charge, courts look to "whether the allegations are like or reasonably related to those contained in the EEOC complaint." *Ezell v. Potter*, 400 F.3d 1041, 1046 (7th Cir. 2005). Claims are reasonably related when (1) "there is a reasonable relationship between the allegations in the charge and the claims in the complaint," and (2) "the claim in the complaint can reasonably be expected to grow out of an EEOC investigation of the allegations in the charge." *Chaidez*, 937 F.3d at 1004 (citing *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994)). "At a minimum, this means that the EEOC charge and the complaint must describe the same conduct and implicate the same individuals." *Ezell*, 400 F.3d at 1046.

The Court is paraphrasing, but Captain MacEwen claims in the first charge (450-2024-06444) that he had a disability for which he requested "reasonable accommodations" that were denied and instead received "threats to [his] employment status." (Filing No. 30-1 at 1). He recounted a missed peer meeting due to the unavailability of seating on a flight, despite Captain MacEwen having the right to a "guaranteed seat" for his monthly meetings, which he was not informed of "from the beginning." *Id.* This resulted in a report to the "FAA [] defaming [his] character," and continued negative reports despite his documented sobriety. *Id.* Captain MacEwen stated that these negative reports were because he "asked for reasonable accommodations in the form of accountability from his [manager's] office." *Id.* Captain MacEwen stated that his manager needed to show him "tough love" because of his disability. He also stated that his manager had it

27

out for him because of Captain MacEwen's disability and "whistle blowing activities." *Id.* Captain MacEwen concluded that he was "discriminated against because of [his] disability and retaliated against for engaging in protected activity, in violation of the [ADA]." *Id.* He was issued a notice of right to sue on December 1, 2025 (Filing No. 23 at 4 ¶ 24; Filing No. 29 at 16).

In Captain MacEwen's second charge (470-2025-02145), he discussed the background relating to the special issuance and his asserted right to medical privacy (Filing No. 29-7 at 3). Under threat of being placed on leave without pay, and despite his protestation, Captain MacEwen was forced to provide his special issuance to a chief pilot, which contained his medical information. *Id.* Captain MacEwen concluded that he "was retaliated against for asserting [his] right to medical privacy and filing an EEOC Charge in violation of the [ADA]." *Id.* He was issued a notice of right to sue on June 20, 2025 (Filing No. 23 at 4 ¶ 23).

### a. **ADA**

Given the factual matter contained in the charges, the Court finds that Captain MacEwen has properly exhausted his ADA claims through the EEOC. It is true that much of the matter contains conclusory or vague assertions, such as the claim that he requested a reasonable accommodation without identifying the accommodation. He instead made a vague reference to "accountability" from his manager's office. But there is a reference to at least some inability to attend his monthly peer meeting, which, taken liberally (given his *pro se* status), might state a claim for discrimination if done because of a disability. The same is true of the need to show "tough love" because of a disability, which may show a discriminatory motive.

Captain MacEwen likewise has exhausted his retaliation and interference claims under the ADA because there are sufficient references to what could be construed as adverse actions or harassment because of activity protected by the ADA. Requesting an accommodation can be considered activity protected by the ADA. Likewise, a reference to asserting a right to medical

privacy could inform the EEOC of potentially protected activity. And threats to his employment status and "negative reports" could alert the EEOC to retaliatory actions by American for engaging in protected activity.

While there is sufficient information for the Court to find the ADA claims were exhausted based on some factual matter alleged, this is not the end of the inquiry. "When an EEOC charge alleges a particular theory of discrimination, allegations of a different type of discrimination in a subsequent complaint are not reasonably related to them unless the allegations in the complaint can be reasonably inferred from the facts alleged in the charge." *See Ajayi v. Aramark Business Servs., Inc.*, 336 F.3d 520, 527 (7th Cir. 2003). Going forward, the Court is inclined to limit Captain MacEwen's allegations in the complaint that can be reasonably inferred from the claims in the charges. As will be discussed, for now, Captain MacEwen's ADA claims will proceed in this case.[6]

### b. **Title VII**

As to claims under Title VII, the Court agrees that Captain MacEwen failed to exhaust his administrative remedies (Filing No. 23 at 14, Counts Four and Five). Each charge lacks anything mentioning, discussing, or referencing religion, or anything remotely related to or that would implicate religion. *See Ajayi*, 336 F.3d at 527 (finding "nothing about [the] EEOC charge that would reasonably lead one to conclude that [the plaintiff] was a victim of age discrimination," because it did not "mention age . . . [or] any other facts that might have alerted the EEOC to the claim."). Absent from both charges is anything that could support a colorable argument that he sought to raise a Title VII claim.

---

[6] Captain MacEwen's ADA claims may be limited in scope based on when the claim arose and when his EEOC charge was filed. *See Gul-E-Rana Mirza v. The Neiman Marcus Grp., Inc.*, 649 F. Supp. 2d 837, 850 (N.D. Ill. 2009) (stating "claims arising from discrete acts of discrimination must be brought within the appropriate 180– or 300–day limitations period." (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 105 (2002)). But the Court need not determine the scope of his claims at the pleadings stage.

Captain MacEwen never discussed any objections to AA based on religious grounds, or any requirement that he be forced to attend AA. In fact, the charge is completely silent as to any reference to AA or alcoholics anonymous. Assuming that would be enough to assert a Title VII religious discrimination claim, it is clear that such a claim was not exhausted through the administrative remedies available to Captain MacEwen. Because this is a precondition to bringing a Title VII claim, the Court dismisses Counts Four and Five without prejudice,[7] for failure to state a claim.

Of the claims remaining for discussion (ADA discrimination, failure to accommodate, retaliation/interference, and intentional infliction of emotional distress), American challenges the sufficiency of the complaint.

### 2.   Failure to State a Claim for Relief

#### a.   ADA

With the exception of retaliation claims, a person asserting a claim under the ADA must be a "qualified individual," which is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). As the title implies, the ADA applies to qualified individuals with a disability. *Id.* at § 12102(1). This can include alcohol dependence or alcoholism. *See, e.g., Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 670 (7th Cir. 2011) ("Alcoholism may qualify as a disability if it 'substantially limits one or more major life activities.'") (quoting 42 U.S.C. § 12102(1)); *see also Freeman v. Metro. Water Reclamation Dist. of Greater Chicago*, 927 F.3d 961,

---

[7] *See Cheek*, 31 F.3d at 500 (stating that exhausting claims "is a condition precedent with which Title VII plaintiffs must comply."); *Teal v. Potter*, 559 F.3d 687, 693 (7th Cir. 2009) (finding dismissal for failure to exhaust should be without prejudice).

965 (7th Cir. 2019); *Budde v. Kane Cnty. Forest Pres.*, 597 F.3d 860, 861 (7th Cir. 2010). With this in mind, the Court turns to the pleading requirements of the individual claims.

The pleading requirements for a discrimination claim are minimal: "A complaint that identified the type of discrimination the plaintiff thought occurred, by whom, and when was all the plaintiff needed to put in her complaint." *Huri v. Off. of the Chief Judge of the Cir. Ct. of Cook Cnty.*, 804 F.3d 826, 833 (7th Cir. 2015) (cleaned up). To state a claim for failure to accommodate under the ADA, a plaintiff must allege that he is a qualified individual with a disability; (2) the employer was aware of his disability; and (3) the employer failed to reasonably accommodate that disability. *Preddie v. Bartholomew Consolidated Sch. Corp.*, 799 F.3d 806, 813 (7th Cir. 2015) (citing *Kotwica v. Rose Packing Co.*, 637 F.3d 744, 747–48 (7th Cir. 2011)). And lastly, to state a claim for retaliation, a plaintiff only needs to allege that he engaged in statutorily protected activity under the ADA; (2) the employer took adverse action against the plaintiff; and (3) the protected activity caused the adverse action. *Id.* at 814.

There are sufficient allegations that if taken as true plausibly allege ADA claims. Captain MacEwen alleges that American engaged in conduct amounting to "targeted scrutiny" that effectively amounts to discrimination throughout his tenure with the company (Filing No. 23 at ¶¶ 39–46, 56). For instance, in 2023, he claims that Captain Airey began imposing a rigid requirement that he meet in Philadelphia despite Captain MacEwen's being based in Washington D.C. *Id.* And the negative reports in his employment file or to the FAA, at the pleading stage, are enough to state a claim because Captain MacEwen alleges that this was done because of his alleged disability. *Id.* The same is true of the claim that Captain Firmin supposedly made misleading statements to the TSA. *Id.*

31

American argues that Captain MacEwen was not employed by the TSA and the flight deck officer program administered by that agency was not a materially adverse employment action. Perhaps. But the Court is unwilling to make such a determination at the pleading stage on an empty factual record, particularly, where the fact could support a retaliation theory. *See Freelain v. Vill. of Oak Park*, 888 F.3d 895, 901 (7th Cir. 2018) ("The category of actions prohibited by the statutes' anti-retaliation provisions is broader than the category of adverse employment actions prohibited by the statutes' anti-discrimination provisions.").

American also argues that the allegations do not indicate a causal relationship between any asserted protected activity and an adverse action. But there is enough in the complaint to advance the claims beyond this stage. *See Huri*, 804 F.3d at 833 ("The [plausibility] standard simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence supporting the allegations."). This is not to say that every allegation supports Captain MacEwen's theories. For example, Captain MacEwen's claims that refusing to provide his special issuance to American or the aircraft swap incident in September 2025. Whether these allegations are actionable is debatable. But the Court declines to grapple over these questions when the central issue is whether there is enough factual matter to plausibly state a claim for relief. And because there is, the Court must deny American's motion as to Captain MacEwen's ADA claims.

**b.  <u>Intentional Infliction of Emotional Distress</u>**

"The Indiana Supreme Court defined the perpetrator of the tort of intentional infliction of emotional distress as: 'one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another.'" *Skinner v. Metro. Life Ins. Co.*, 829 F. Supp. 2d 669, 683 (N.D. Ind. 2010) (quoting *Cullison v. Medley*, 570 N.E.2d 27, 31 (Ind. 1991)). "The elements of the tort are that the defendant '(1) engages in extreme and outrageous conduct (2) which

32

intentionally or recklessly (3) causes (4) severe emotional distress to another.'" *Id.* (quoting *Cullison*, 570 N.E.2d at 31).

While Captain MacEwen's allegations are enough to satisfy the requirement that he suffered severe emotional distress (Filing No. 23 at ¶ 130), his claim fails to plausibly allege conduct that goes "'beyond all possible bounds of decency'—the type of conduct 'regarded as atrocious and utterly intolerable in a civilized society.'" *Id.* (quoting *Lindsey v. DeGroot*, 898 N.E.2d 1251, 1264–65 (Ind. Ct. App. 2009)). In *Skinner*, the court found the plaintiff failed to sufficiently allege extreme and outrageous conduct. *Id*. Skinner alleged the defendant mishandled her "disability waiver of premium benefit," because it was denied and unreasonably delayed. *Id.* at 685. And "by not waiving her payments of the premium, [the defendant] knew or should have known that it would cause [the plaintiff] financial harm, extreme emotional injury, pain and suffering, and distress." *Id.* (internal quotation marks and citation omitted). Finally, the plaintiff claimed the defendant "falsely accused her of not complying with her responsibilities under the policy even though she fully complied." *Id.* The court held that these allegations did not plausibly set out conduct that was extreme and outrageous.

Captain MacEwen's complaint likewise falls short of plausibly alleging extreme and outrageous conduct. Those claims include coercion into participation in AA, burdensome monthly peer meeting requirements, accusations of abusing sick leave, threatening job security or leave status, supposedly defamatory statements to the TSA, refusal to accept Captain MacEwen's verification of his special issuance, and allegations that Captain MacEwen refused to swap aircraft (Filing No. 23 at ¶ 126–30). This is conduct analogous to run-of-the-mill employment grievances with an employer—not conduct that is egregious, like someone forcing their way into another's

33

home and threatening him with a gun, which is still not enough to satisfy extreme and outrageous. *See id.* (citing *Cullison*, 570 N.E.2d at 29).

Captain MacEwen's intentional tort against American falls short. There is simply not enough in the amended pleading to establish the stringent standard, and the Court agrees that dismissal is appropriate. The Court therefore dismisses Count Six, the intentional tort claim against American.

## IV.    <u>CONCLUSION</u>

A motion to dismiss under Rule 12(b)(6) does not test whether the plaintiff will prevail on the merits but instead whether the claimant has properly stated a claim. *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). For the reasons set forth above, Defendants' Motion to Dismiss (Filing No. 28) is **GRANTED in part** and **DENIED in part**. Defendants' motion to dismiss Plaintiff's claim of religious discrimination and retaliation under Title VII (Count Four and Count Five) against American are **dismissed without prejudice** for failure to state a claim upon which relief can be granted.

Defendants' motion to dismiss for lack of personal jurisdiction is **granted** and Plaintiff's claim of intentional infliction of emotional distress (Count Six) as to Defendants Airey, Wooley, and Firmin is **dismissed without prejudice** for lack of personal jurisdiction. Plaintiff's claim of intentional infliction of emotional distress (Count Six) against American Airlines is also **dismissed without prejudice** for failure to state a claim upon which relief can be granted.

Defendants' motion to dismiss as to Plaintiffs ADA claims (Counts One, Two and Three) is **denied**, and these three claims have survived the initial hurdle of a motion to dismiss. Whether these claims can survive summary judgment is a matter for another day.

The **Clerk is directed** to terminate from the docket Defendants Timothy Airey, Adrienne Wooley, and Kieth Firmin.

In addition, Captain MacEwen's Motion for Leave to File Declaration in Support of Opposition to Defendants Motion to Dismiss (Filing No. 38) is **DENIED**.

      **SO ORDERED**.

Date: 6/9/2026

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

Distribution:

MAURICE CAPTAIN MACEWEN
12842 Drumdow Ln.
Fishers, IN 46037

Ada W. Dolph
SEYFARTH SHAW LLP (Chicago)
adolph@seyfarth.com

Taylor Iaculla
Seyfarth Shaw LLP
tiaculla@seyfarth.com