FILED
08/25/2026
U.S. DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
Kristine L. Seufert, Clerk

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

CAPTAIN MAURICE MACEWEN,
Plaintiff,
v.
AMERICAN AIRLINES, INC.,
Defendant.

Case No. 1:25-cv-01580-TWP-MJD

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COUNT IV OF THE SECOND AMENDED COMPLAINT**

Plaintiff Captain Maurice MacEwen, proceeding pro se, respectfully submits this Response in Opposition to Defendant American Airlines, Inc.'s Motion to Dismiss Count IV of Plaintiff's Second Amended Complaint (Filing No. 51).

## I. INTRODUCTION

American's present motion is narrow. Plaintiff's three ADA claims survived American's prior motion to dismiss, and American has answered those claims. The present motion attacks only Count IV, Plaintiff's Indiana common-law claim for intentional infliction of emotional distress ("IIED").

The Court dismissed Plaintiff's earlier IIED claim without prejudice because the prior pleading did not sufficiently allege conduct meeting Indiana's demanding "extreme and outrageous" standard. Filing No. 40 at 33–34. The Court expressly found, however, that Plaintiff had adequately alleged severe emotional distress. Id. at 33. The Second Amended Complaint ("SAC") was materially expanded to address the precise deficiency the Court identified.

The SAC does not merely allege disagreements about scheduling, sick leave, or ordinary management decisions. It alleges that American knew Plaintiff's ability to earn his livelihood as a professional airline pilot depended on maintaining an FAA First-Class medical certificate; knew that his HIMS/Special Issuance status made adverse information concerning compliance,

stability, discipline, or medical status uniquely dangerous to his career; and nevertheless used that known vulnerability as leverage. SAC ¶¶ 122–24.

Among other things, Plaintiff alleges that American or its agents:

1. characterized a travel and scheduling problem as serious HIMS non-compliance and transmitted an extensive adverse report to Plaintiff's HIMS physician, then failed to materially correct that report after learning facts undermining it, SAC ¶ 125;
2. generated additional potentially damaging employment records through a targeted "holiday sick" investigation and Personnel Event History entry, SAC ¶ 126;
3. participated in a high-pressure multi-person meeting in which Plaintiff's employment and continued FAA medical sponsorship were threatened, including an alleged threat to withdraw Special Issuance sponsorship to compel Plaintiff's submission, SAC ¶ 127;
4. supplied TSA investigators with materially false or misleading information that Plaintiff had been disciplined, disclosed disability/HIMS-related information, and affirmatively recommended against Plaintiff's FFDO candidacy; the SAC further alleges that Plaintiff learned the content and effect of those communications through TSA records released under FOIA, thereby losing a distinct federal professional and public-safety opportunity even though FFDO service itself is uncompensated, SAC ¶¶ 64–70, 128;
5. removed Plaintiff from active flight status and threatened loss of income while attempting to compel disclosure of private medical documentation, despite alternative verification and written confirmation from an FAA official concerning the updated Special Issuance, SAC ¶ 129; and
6. continued heightened scrutiny after Plaintiff complained of discrimination and retaliation, SAC ¶ 130.

Viewed collectively, and in light of the knowledge alleged in paragraphs 122 through 132, those allegations plausibly describe something materially different from the "run-of-the-mill employment grievances" addressed by the Court previously. Filing No. 40 at 33.

American also asks this Court to apply a mental-state rule different from the one the Court itself stated in its June 9, 2026 Order. The Court held that Indiana IIED requires extreme and outrageous conduct that "intentionally or recklessly" causes severe emotional distress. Filing No. 40 at 32–33. That formulation is also the current Indiana rule. In Harris v. Deaconess Hospital, Inc., the Indiana Court of Appeals confronted the precise tension on which American relies and held that "intent to harm isn't required"; recklessness is sufficient. 235 N.E.3d 224, 232 (Ind. Ct. App. 2024).

Plaintiff expressly pleads that alternative mental state. SAC ¶ 132 alleges that American's managers either intended to cause emotional distress or acted in reckless disregard of the near certainty that threatening Plaintiff's medical certificate, livelihood, and professional standing through false or distorted disability-related information would cause severe distress. The preceding paragraphs allege why American knew that risk. SAC ¶¶ 122–31.

The central question at this stage is not whether Plaintiff will ultimately prove those allegations. It is whether, accepting them as true and drawing reasonable inferences in Plaintiff's favor, Count IV plausibly states a claim. It does. The Motion should be denied.

**II. LEGAL STANDARD**

A motion under Rule 12 does not test whether Plaintiff will ultimately prove his allegations. It tests whether the complaint contains sufficient factual matter, accepted as true, to state a plausible claim for relief. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).

The Court must accept well-pleaded factual allegations as true and draw reasonable inferences in Plaintiff's favor. Because Plaintiff proceeds pro se, his pleading is also construed liberally. Perez v. Fenoglio, 792 F.3d 768, 776 (7th Cir. 2015). The Court previously emphasized in this action that a Rule 12(b)(6) motion "does not test whether the plaintiff will prevail on the merits but instead whether the claimant has properly stated a claim." Filing No. 40 at 34.

Under Indiana law, IIED occurs when a defendant, through extreme and outrageous conduct, intentionally or recklessly causes severe emotional distress. Cullison v. Medley, 570 N.E.2d 27, 31 (Ind. 1991); Harris, 235 N.E.3d at 232. Where reasonable persons can differ over whether alleged conduct is sufficiently extreme and outrageous, Indiana law leaves the question to the factfinder. Bradley v. Hall, 720 N.E.2d 747, 752–53 (Ind. Ct. App. 1999).

## III. ARGUMENT

### A. American's Proposed Intent Standard Conflicts With This Court's Own Order and With Harris.

American first argues that Count IV fails because Plaintiff supposedly has not alleged the requisite intent. Filing No. 52 at 7–8. It contends that Indiana law requires allegations that American either "specifically intended to inflict an injury" or had "actual knowledge that an injury was certain to result." Id. at 7. That is not the governing IIED standard.

The strongest answer is already in this Court's June 9 Order. In addressing Plaintiff's earlier IIED claim, the Court stated that the elements are extreme and outrageous conduct "which intentionally or recklessly" causes severe emotional distress. Filing No. 40 at 32–33 (quoting Skinner v. Metro. Life Ins. Co., 829 F. Supp. 2d 669, 683 (N.D. Ind. 2010), and Cullison, 570 N.E.2d at 31). The Court dismissed the earlier count because the alleged conduct did not sufficiently meet the extreme-and-outrageous threshold—not because Plaintiff was required to plead a stricter mental state. Id. at 33–34.

Harris independently resolves the issue. There, as here, the defendant argued that actual intent to cause emotional harm was required. The Indiana Court of Appeals examined Cullison, Doe v. Methodist Hospital, the Restatement, and earlier Indiana authority and expressly concluded that "intent to harm isn't required." Harris, 235 N.E.3d at 232. The court held that a defendant who recklessly causes severe emotional distress through extreme and outrageous conduct may be liable for IIED. Id.

Harris also adopted the Restatement § 46 comment i understanding of recklessness: liability can exist where an actor proceeds in deliberate disregard of a high degree of probability that emotional distress will follow. Id. at 231–32. Harris specifically acknowledged the tension between older "intent to harm" language and the "intentionally or recklessly" formulation and resolved that tension in favor of recklessness. Id.

American's reliance on Robinson v. Lake Minnehaha Owner's Ass'n, No. 2:12-CV-108-TLS, 2012 U.S. Dist. LEXIS 175642 (N.D. Ind. Dec. 12, 2012), and Baker v. Westinghouse Electric Corp., 637 N.E.2d 1271 (Ind. 1994), therefore does not support the stricter rule American proposes. Robinson predates Harris by more than a decade. Baker addressed when an intentionally inflicted workplace injury falls outside Indiana Workers' Compensation Act exclusivity; its "deliberate intent" analysis did not displace the IIED mental-state rule that Harris later clarified.

The SAC satisfies Harris. Paragraph 132 alleges that American's managers and agents knew the uniquely coercive consequences of their actions and either "intended to cause emotional distress or acted in reckless disregard of the near certainty that threatening Plaintiff's medical certificate, livelihood, and professional standing through false or distorted disability-related information would cause severe distress." SAC ¶ 132. "Reckless disregard of the near

certainty" of severe distress is at least as strong as Harris's deliberate-disregard-of-a-high-probability formulation.

Nor is paragraph 132 an isolated conclusion. Paragraphs 122 through 131 allege why American possessed that knowledge: the regulatory importance of Plaintiff's medical certificate, the significance of HIMS and Special Issuance information, the career consequences of adverse compliance or discipline reports, and American's alleged use of precisely those mechanisms after Plaintiff objected. American's intent argument therefore fails.

The pleaded facts also permit a reasonable inference that the pressure imposed on Plaintiff was not merely an incidental byproduct of neutral administration. The SAC alleges that, when Captain Airey assumed responsibility for administering Plaintiff's Special Issuance requirements, Airey told Plaintiff that he would need to use "tough love." SAC ¶ 45. After the April 2024 incident, when Plaintiff traveled to PHL on personal time and attempted to resolve the matter face-to-face, Airey allegedly told him that the adverse report had already been sent—"It's already been done"—and added, "Do not confuse my kindness with weakness." SAC ¶¶ 50–51. Those alleged statements, considered together with the later threats to employment, medical sponsorship, flight status, and income, support the plausible inference that management understood the coercive pressure being applied and deliberately continued to apply it. At Rule 12, American may offer a different explanation for why its managers acted, but the Court may not resolve that competing factual inference against Plaintiff.

**B. The SAC Plausibly Alleges Extreme and Outrageous Conduct, and American Cannot Obtain Dismissal by Recharacterizing or Resolving the Pleaded Facts in Its Own Favor.**

American next recasts Count IV as a disagreement over routine managerial oversight. Filing No. 52 at 8–10. That characterization works only by removing the context pleaded in the SAC and substituting American's preferred factual account for Plaintiff's allegations.

The TSA/FFDO allegations illustrate the problem. American describes the matter as merely "providing information to a federal agency" conducting a background investigation. Filing No. 52 at 9. The SAC alleges something materially different: Plaintiff obtained TSA records through the Freedom of Information Act and learned that an American Airlines chief pilot—the interview the SAC attributes to Captain Keith Firmin—had told the investigator that Plaintiff had a substance-abuse problem and was in recovery, stated that Plaintiff had "quite the temper," represented that Plaintiff had been disciplined while being unable to identify the supposed discipline, stated that Plaintiff had "too many negative things going on," and opened the interview by stating, "Let me save you a lot of time, I do not recommend this candidate for the FFDO Program." SAC ¶¶ 64–70, 128.

The SAC further alleges that those statements were contradicted by Plaintiff's actual employment record and by Captain Airey's later written confirmation that there was "nothing remarkable" in Plaintiff's personnel file. SAC ¶¶ 63, 65–67. That allegation is not a bare suspicion about what might have been said to TSA; it identifies the government records through which Plaintiff learned what was communicated. The underlying TSA material also reflects that Plaintiff's applicant interview recorded "No formal disciplinary actions," while the American chief-pilot interview represented that he had been disciplined. Whether American can ultimately reconcile those contradictory records is a merits question, not a basis for dismissal.

The alleged causal link is equally concrete. The SAC alleges that the FOIA records indicated Plaintiff's FFDO application was denied in substantial part because of the chief-pilot statements. SAC ¶ 70. The TSA material identified in the SAC includes an internal February 24, 2023 email from an Aviation Programs Branch program analyst stating, in substance, that Plaintiff "was not recommended due to the CP statement" and "was not recommended for the

program." Thus, American's characterization asks the Court to replace a pleaded allegation of false, disability-related, outcome-affecting statements with the benign label "providing information." Rule 12 does not permit that recharacterization.

The absence of additional wages does not make the alleged FFDO loss professionally meaningless. Congress created the FFDO program to deputize qualified volunteer air-carrier pilots as federal law-enforcement officers responsible for defending flight decks against criminal violence and air piracy. 49 U.S.C. § 44921(a), (d). Congress separately provides that FFDO service is uncompensated. Id. § 44921(e). Thus, selection and deputization would have represented a distinct federal professional and public-safety qualification—a favorable credential and professional distinction apart from salary. The SAC plausibly alleges that Plaintiff lost that opportunity because an American chief pilot supplied materially adverse information and affirmatively recommended against his candidacy.

That allegation also bears directly on intent and recklessness. The alleged opening statement—"Let me save you a lot of time, I do not recommend this candidate for the FFDO Program"—permits a reasonable inference that the chief pilot was not merely neutrally answering background questions but was affirmatively seeking to defeat the candidacy. Combined with TSA's alleged internal statement that Plaintiff "was not recommended due to the CP statement," the pleaded facts allow an inference of deliberate interference with a positive federal professional opportunity. American may dispute that inference after discovery; it is not entitled to have the contrary inference adopted on a motion to dismiss.

The Special Issuance dispute is similar. American characterizes its conduct as simply "verifying that a restriction had been removed from his SI by obtaining a copy of the SI." Filing No. 52 at 9. But the SAC alleges that a later updated Special Issuance superseded the prior

authorization and removed the monthly chief-pilot-meeting requirement; that Plaintiff repeatedly represented that he remained medically qualified; that American rejected narrower means of verification; that American removed him from active flight status and threatened unpaid or withheld status; and that it ultimately compelled him to display private medical documentation. SAC ¶¶ 86–92, 129.

American's Exhibit 3 does not eliminate that pleaded dispute. Even assuming Filing No. 53-3 may be considered at this stage, proof that an earlier Special Issuance contained a monthly-meeting requirement does not contradict the SAC's express allegation that a later superseding authorization removed it. Nor should Dr. David O'Brien's separate February 11, 2025 memorandum be overstated: the memorandum did not itself say that chief-pilot meetings had been removed. It stated that Plaintiff's medical certificate was "current and active" and that he was "in full compliance with FAA medical certification requirements." The significance pleaded by Plaintiff is chronological and contextual. That FAA confirmation came after issuance of the superseding SI, after Plaintiff had told American that the meeting requirement no longer applied, and while American continued to withhold him from active service. SAC ¶¶ 86–92, 129. At minimum, those allegations permit the inference that American had authoritative evidence of current FAA medical compliance while continuing to insist on disclosure of the underlying SI.

The manner in which American allegedly demanded the document also matters to the pleaded theory. The SAC alleges that American removed Plaintiff from active flight status, threatened a change to unpaid or withheld status, rejected narrower verification, and ultimately compelled him to display private medical documentation despite his privacy objections and evidence of current FAA qualification. SAC ¶¶ 86–92, 129. Nor does American's observation that Plaintiff had supplied earlier SIs "without incident" establish consent in perpetuity. The SAC

alleges that, by January 2025, Plaintiff had expressly asserted medical privacy, had engaged in protected activity, and was dealing with a superseding SI whose company-participation requirements had materially changed. Filing No. 52 at 9 n.9; SAC ¶¶ 86–92, 117–18, 129.

The April 2024 incident is likewise not pleaded as a mere scheduling disagreement. The SAC alleges that Plaintiff was unable to reach PHL for the scheduled Friday meeting because last-minute standby seating became unavailable; that he did not refuse to comply; that he traveled to PHL on his personal day off the following Monday and met Captain Airey face-to-face while substantial time remained in the month; and that Airey nevertheless refused to count the encounter and told Plaintiff the adverse report had already been submitted. SAC ¶¶ 49–52. Plaintiff further alleges that he later learned American could have authorized higher-priority A12/positive-space travel for the required meeting, that he had not previously been informed of that option, and that American failed or refused to materially correct the adverse report after that fact became known. SAC ¶¶ 53–54, 125. Those allegations plausibly describe repeated efforts to comply, followed by escalation and adverse reporting, rather than intentional avoidance of an FAA requirement.

The distinction is material. The SAC alleges that the FAA required a monthly in-person chief-pilot or flight-operations meeting, but that Captain Airey imposed additional administrative restrictions concerning PHL and a particular week of the month. SAC ¶¶ 43–47. Plaintiff's requests to conduct a meeting while already passing through PHL, to reschedule within the same month, or to use a workable travel method therefore cannot simply be assumed to be requests for noncompliance with the FAA mandate. The pleaded theory is that American converted disputes over the manner and convenience of compliance into adverse medical-monitoring information capable of affecting Plaintiff's federal medical certificate.

The SAC also alleges a broader context in which Plaintiff's actual sobriety and medical qualification were not the disputed issue. It alleges that management communications distorted ordinary scheduling efforts as resistance or noncompliance even though Plaintiff remained abstinent and medically qualified. SAC ¶¶ 47–48, 122–25. That distinction matters because an employer's criticism of scheduling is one thing; transmitting that criticism through a medical-monitoring channel in a manner capable of implying deficient recovery or regulatory noncompliance is materially different when the employer allegedly knows the consequences such information can carry for a professional pilot.

The "quad" meeting adds another alleged pressure point. Plaintiff alleges that management and HIMS-related personnel surrounded him in a high-pressure meeting, characterized a frustrated communication as a threat, threatened his employment, and threatened the medical sponsorship necessary to preserve his career in order to compel submission and silence objections. SAC ¶ 127. Those allegations must be considered together with the alleged false federal reporting, adverse medical communications, medical-document coercion, and repeated refusal to correct damaging information.

Count IV therefore does not rest on the proposition that an employer commits IIED whenever it schedules a meeting, investigates sick leave, answers a federal inquiry, or verifies a pilot's qualifications. The pleaded theory is that American allegedly used its unusual power over medical, compliance, and federal-agency information—while knowing the career-ending stakes for this particular employee—to create, transmit, perpetuate, and threaten damaging information and consequences. SAC ¶¶ 122–32. The Court need not decide now whether a jury will ultimately accept that theory; it need only decide whether the pleaded course of conduct plausibly crosses Indiana's threshold. It does.

**C. Indiana Law Makes American's Knowledge of Plaintiff's Particular Vulnerability and the Employment Context Legally Significant.**

The factual context American attempts to strip from the claim is part of the Indiana IIED analysis. In J.H. v. St. Vincent Hospital & Health Care Center, Inc., the Indiana Court of Appeals relied on Restatement § 46 comments i and f and recognized that conduct may become extreme and outrageous because the actor knows the other person is peculiarly susceptible to emotional distress because of a physical or mental condition or other peculiarity. 19 N.E.3d 811, 820 (Ind. Ct. App. 2014). Conduct that might otherwise fall short can become "heartless, flagrant, and outrageous" when undertaken with such knowledge. Id.

The SAC invokes that principle directly. It alleges American knew Plaintiff had a documented substance-use treatment history; remained subject to the consequential FAA HIMS/Special Issuance framework; depended on continued FAA medical certification for his livelihood; and was particularly vulnerable to false or distorted reports concerning compliance, stability, discipline, or medical status. SAC ¶¶ 122–24. The relevant decisionmakers were not strangers to aviation medical requirements: the SAC identifies chief-pilot and flight-operations personnel charged with administering or reporting on Plaintiff's SI compliance. From those roles, and from the alleged history of reporting to HIMS physicians, it is reasonable at the pleading stage to infer that they understood that adverse HIMS, discipline, or medical-compliance information could jeopardize a pilot's certification, career, income, and professional standing.

Indiana authority also undermines American's suggestion that the employment setting itself makes the conduct nonactionable. In Bradley v. Hall, an employee alleged that her supervisor harassed and criticized her, intruded into intimate health and marital subjects, misrepresented the security of her job, and contributed to severe distress. 720 N.E.2d at 749–53.

The Indiana Court of Appeals reversed summary judgment, holding that reasonable persons could differ over outrageousness and that the issue therefore could not be taken from the factfinder. Id. at 752–53. Bradley does not establish that every workplace dispute is actionable; it establishes the opposite of American's categorical theme: employment context does not immunize conduct when the pleaded circumstances and abuse of sensitive pressure points may reasonably be viewed as outrageous.

American's reliance on Harriston v. Chicago Tribune Co., 992 F.2d 697 (7th Cir. 1993), is also less instructive than its brief suggests because Harriston applied Illinois IIED law. The governing substantive law here is Indiana law. And the Indiana cases most relevant to Plaintiff's pleaded theory—Harris, J.H., and Bradley—require attention to recklessness, known susceptibility, and the full factual context rather than reduction of the claim to generic "managerial oversight."

The remaining employment cases cited by American involve materially different allegations. Plaintiff is not relying only on a firing, a shift change, an unemployment dispute, harsh criticism, or an isolated accusation. He alleges a sustained course of conduct involving medical privacy, allegedly false discipline information furnished to a federal security program, adverse information transmitted within a medical-certification system, threats to medical sponsorship, threats to income, and refusals to correct damaging information after contrary facts became known. Those allegations must be evaluated on their own facts.

**D. The SAC Materially Addresses the Exact Deficiency Identified in the Court's Prior Order.**

American emphasizes that Plaintiff has filed multiple complaints and suggests that the SAC simply repeats what the Court already rejected. Filing No. 52 at 1, 10. It does not.

The June 9 Order found severe emotional distress sufficiently alleged but concluded that the earlier complaint described conduct analogous to "run-of-the-mill employment grievances." Filing No. 40 at 33–34. The Court dismissed the claim without prejudice. Id. at 34. Plaintiff then amended directly toward that deficiency.

Among the material additions, Count IV now alleges:

- American's specific knowledge of the career-ending significance of adverse HIMS, Special Issuance, discipline, safety, and compliance information, SAC ¶ 122;
- American's knowledge that Plaintiff's medical and regulatory history made him uniquely vulnerable to such reports and threats, SAC ¶ 123;
- the alleged use of that known vulnerability as leverage, SAC ¶ 124;
- failure or refusal to correct an allegedly misleading HIMS report after learning contrary facts, SAC ¶ 125;
- creation of additional records allegedly capable of portraying Plaintiff as unreliable, disciplined, or medically concerning, SAC ¶ 126;
- threats involving continued medical sponsorship and employment during a multi-person meeting, SAC ¶ 127;
- an alleged false discipline report to TSA, contradictory information in American's own personnel records, and a subsequent failure to correct the information, SAC ¶ 128;
- rejection of alternative verification, removal from active flight status, threats to income, and compelled display of private medical documentation, SAC ¶ 129;
- continued heightened scrutiny following complaints and protected activity, SAC ¶ 130;
- an express explanation of why the combined conduct was different from ordinary personnel administration, SAC ¶ 131; and

- detailed allegations of intentional or reckless conduct and American's alleged knowledge that severe distress was highly probable, SAC ¶ 132.

Those additions matter under Harris, J.H., and Bradley. They supply the context and knowledge that were missing from the prior formulation of the tort claim.

The Court's own June Order also recognized elsewhere that allegations concerning false or distorted FAA reporting, misrepresentations to TSA, PEH entries, and threats affecting Plaintiff's employment—"if true"—were facts bearing on American's motive. Filing No. 40 at 15. The SAC now goes further by identifying the TSA FOIA records through which Plaintiff alleges he learned the content of the chief-pilot interview and the reason his FFDO candidacy was rejected. SAC ¶¶ 64–70. The alleged loss was not merely a hobby or an unpaid pastime; it was the loss of an opportunity to be selected, trained, and deputized for a federal aviation-security role under 49 U.S.C. § 44921. At this stage, the Court need not decide the ultimate truth of competing accounts; it need only recognize that the SAC's TSA allegations are specific, source-identified, and plausibly tied to a concrete professional loss.

The Court should therefore evaluate the SAC as it presently exists rather than treat the prior without-prejudice dismissal as though it resolved a materially expanded pleading.

**E. Plaintiff's Continued Employment Does Not Defeat an Element the Court Already Found Adequately Pleaded.**

American emphasizes that Plaintiff "remains employed by American as a pilot." Filing No. 52 at 1. Continued employment is not an element of IIED, and it does not establish the absence of severe distress. The Court already held that Plaintiff's prior complaint adequately alleged severe emotional distress. Filing No. 40 at 33.

The SAC now provides still more detail, alleging anxiety, humiliation, sleep disturbance, persistent rumination, fear that each adverse report could end Plaintiff's career, strain within his

marriage and family, diminished ability to be emotionally present with his children, and fear that seeking mental-health treatment could itself generate additional FAA medical-certification consequences. SAC ¶ 133. Paragraph 134 expressly alleges that Plaintiff continued performing safety-sensitive duties and did not require psychiatric hospitalization, but that his continued employment did not eliminate the distress.

Indiana IIED law does not require loss of employment or psychiatric hospitalization as an additional element. American's observation that Plaintiff remains a pilot therefore provides no basis to dismiss a claim whose severe-distress element this Court already found sufficiently pleaded.

**F. The Statute of Limitations Does Not Eliminate the TSA/FFDO Allegations at the Pleading Stage.**

American asserts that because Indiana applies a two-year limitations period to IIED, "only conduct occurring on or after August 8, 2023, can support Plaintiff's IIED claim." Filing No. 52 at 6. That statement assumes an accrual date that the face of the SAC does not establish.

Indiana applies the discovery rule to tort claims. A claim generally accrues when the plaintiff knew, or through ordinary diligence should have discovered, that an injury had been sustained as a result of the tortious act of another. Fager v. Hundt, 610 N.E.2d 246, 250 (Ind. 1993).

Although Plaintiff learned that his FFDO application had been denied in February 2023, the SAC alleges that he did not learn what Captain Firmin had allegedly communicated to TSA, or that the chief-pilot communication was the asserted basis for non-acceptance, until he later obtained responsive FOIA records. SAC ¶¶ 64–70. Those records allegedly disclosed both the content of the American chief-pilot interview and an internal TSA communication tying the non-acceptance to the chief-pilot statement. Knowledge that an application was unsuccessful is not

necessarily knowledge that the loss resulted from allegedly false or wrongful conduct by one's employer.

Thus, the SAC does not establish that Plaintiff knew or reasonably should have known before August 8, 2023 that the FFDO injury allegedly resulted from wrongful conduct by American. The distinction matters under Fager: knowledge of an adverse outcome is not necessarily knowledge that the injury resulted from another's tortious act.

The limitations period is also an affirmative defense. A complaint need not anticipate and defeat affirmative defenses, and dismissal on limitations grounds at the pleading stage is appropriate only when the complaint itself establishes an "airtight" defense. Richards v. Mitcheff, 696 F.3d 635, 637–38 (7th Cir. 2012). The SAC does not do so.

Moreover, even apart from the FFDO allegations, Count IV pleads numerous allegedly wrongful acts occurring well within the two-year period. The limitations argument therefore cannot justify dismissal of Count IV as a whole. And even if the Court later concludes that some earlier act cannot independently support damages, earlier events may remain relevant context for American's alleged knowledge, the relationship between the parties, and the significance of later conduct.

**G. Dismissal With Prejudice Is Not Warranted.**

Finally, American asks the Court to dismiss Count IV with prejudice primarily because this is Plaintiff's Second Amended Complaint. Filing No. 52 at 10. The number of pleadings does not itself establish futility.

The Court dismissed the prior IIED claim without prejudice and identified the deficiency: the conduct as then pleaded did not sufficiently rise above ordinary employment grievances. Filing No. 40 at 33–34. Plaintiff then materially amended Count IV to allege known

vulnerability, alleged exploitation of that vulnerability, false or misleading federal and medical reporting, refusal to correct damaging information, threats to FAA medical sponsorship and income, and a detailed reckless mental state. SAC ¶¶ 122–35. Those allegations directly address the Court's prior reasoning.

The published Indiana decision in Harris also directly undermines American's principal legal contention that Plaintiff must allege specific intent to cause emotional harm or actual certainty of injury. At minimum, Harris makes Count IV legally arguable rather than futile.

Further amendment would not be futile even if the Court desired still more factual detail concerning the April 2024 episode. Without asking the Court to treat matters outside the SAC as necessary to the present Rule 12 analysis, Plaintiff notes that contemporaneous records in his possession can supply additional specificity: his April 24, 2024 email records that, on Monday April 22, he traveled directly from VPS to PHL after spending the prior evening in an emergency room with his First Officer, met Captain Airey face-to-face for roughly ten minutes, and then offered to return on April 25, April 26, or April 30 in a final effort to satisfy the monthly requirement. The same email stated that Plaintiff was "willing and able to drop everything in order to commute into town to meet this requirement." Those contemporaneous facts, if amendment were required, would further support Plaintiff's allegation that the dispute concerned management's treatment of his compliance efforts, not a refusal to comply.

The surrounding monitoring records likewise provide additional detail if the Court requires it. Before the April event, American chief-pilot reports documented no issues regarding Plaintiff's SI and no reservations about continued certification; subsequent reports again documented no SI issue and continued abstinence while criticizing such matters as Plaintiff's efforts to move meetings around his commute or to conduct a meeting while already passing

through PHL. That contrast supports Plaintiff's pleaded theory that scheduling and administrative disagreements were being converted into adverse medical-monitoring characterizations despite otherwise favorable compliance information. Plaintiff need not establish that the April report was the only adverse report in his entire history. The relevant point for non-futility is that additional contemporaneous facts exist and can be pleaded if the Court concludes more specificity is necessary.

The same is true of the January 2025 document dispute. If additional detail were required, Plaintiff can plead that American initially directed him to travel to an American base to physically display the updated SI, but a chief pilot later permitted remote display, demonstrating that a materially less burdensome verification method was available. Plaintiff can also plead that his earlier production of SIs occurred while the then-current authorizations actually required company participation, whereas by January 2025 he had expressly asserted medical-privacy and other statutory rights, had engaged in protected activity, and was operating under a superseding SI. These facts further demonstrate why prior voluntary disclosure does not resolve the coercion and recklessness allegations as a matter of law.

Rule 15 embodies a liberal amendment policy, and the Seventh Circuit has emphasized the presumption in favor of allowing an opportunity to cure pleading defects absent a sound reason such as futility, undue delay, undue prejudice, or bad faith. Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Indiana, 786 F.3d 510, 519–21 (7th Cir. 2015). Here, the proper disposition is denial of the Motion because the SAC plausibly states Count IV. Alternatively, if the Court concludes that a particular aspect remains insufficiently pleaded, Plaintiff respectfully requests leave to cure the specifically identified deficiency rather than dismissal with prejudice.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court DENY Defendant American Airlines, Inc.'s Motion to Dismiss Count IV of the Second Amended Complaint (Filing No. 51).

The SAC plausibly alleges that American, with knowledge of Plaintiff's particular medical and regulatory vulnerability, engaged in a sustained course of conduct involving allegedly false or materially misleading HIMS, discipline, and federal-agency information; affirmative interference with a distinct federal FFDO professional opportunity; threats affecting Plaintiff's FAA medical sponsorship and livelihood; refusal to correct damaging information after contrary facts became known; and continued heightened scrutiny after Plaintiff asserted his rights. Indiana law permits IIED liability for reckless, not merely specifically intended, infliction of severe emotional distress through extreme and outrageous conduct. Harris, 235 N.E.3d at 232. At minimum, those allegations warrant factual development rather than dismissal with prejudice.

Dated: August 25, 2026

Respectfully submitted,



**Maurice MacEwen**
Plaintiff, Pro Se
12842 Drumdow Ln.
Fishers, IN 46037
Telephone: 386-295-5463
Email: mauricemac7@hotmail.com

**CERTIFICATE OF SERVICE**

I certify that on August 25, 2026, I submitted the foregoing Plaintiff's Response in Opposition to Defendant's Motion to Dismiss Count IV of the Second Amended Complaint to the Clerk of the United States District Court for the Southern District of Indiana through the Court's electronic filing/submission system.

I further certify that on the same date, I served a true and correct copy upon counsel for Defendant American Airlines, Inc. by electronic mail.

**Maurice MacEwen**
Plaintiff, Pro Se